177 A.3d 768

MARGO S. ARDAN, PLAINTIFF–APPELLANT, v. BOARD OF RE-VIEW, LOURDES MEDICAL CENTER OF BURLINGTON COUNTY, INC., AND ALLIANCE HEALTHCARE, DEFEN-DANTS–RESPONDENTS.

A–35 September Term 2016
077771

Argued October 11, 2017—Decided February 1, 2018

590

592

594

Sarah S. Hymowitz argued the cause for appellant (Legal Services of New Jersey, attorney; Sarah S. Hymowitz, Keith Talbot, Anisa Rahim, and Melville D. Miller, on the briefs).

Christopher J. Hamner, Deputy Attorney General, argued the cause for respondent Board of Review (Christopher S. Porrino, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel, and Robert M. Strang, Deputy Attorney General, on the brief).

Cindy M. Perr, Associate General Counsel, argued the cause for respondent Lourdes Medical Center of Burlington County, Inc. (Lourdes Health System, attorney; Cindy M. Perr, on the brief.)

JUSTICE PATTERSON delivered the opinion of the Court.

New Jersey's Unemployment Compensation Law provides that a person who leaves work "voluntarily without good cause attributable to such work" is ineligible for unemployment benefits until she is "reemployed and works eight weeks in employment" in a new position. N.J.S.A. 43:21–5(a). A regulation prescribes an exception to that rule. It provides that if the claimant left a previous job "due to a physical and/or mental condition or state of health" that "does not have a work-connected origin but is aggravated by working conditions," she is not disqualified from receiving benefits, "provided there was no other suitable work available which

the [claimant] could have performed within the limits of the disability." N.J.A.C. 12:17–9.3(b).

Applying that statute and regulation, we must determine whether the Appellate Division properly denied plaintiff Margo S. Ardan's application for unemployment benefits. We disagree with the Appellate Division's holding that, in all cases, a claimant must prove that she notified her previous employer of her medical condition and sought an accommodation in order to establish the unavailability of "other suitable work" for purposes of N.J.A.C. 12:17–9.3(b). No notice-and-inquiry requirement appears in the regulation as currently drafted; such a mandate may be imposed only by rulemaking pursuant to the Administrative Procedure Act (APA), N.J.S.A. 52:14B–1 to –31.

We concur with the Appellate Division panel, however, that in the circumstances of this case, Ardan did not meet her burden to prove that she is within N.J.A.C. 12:17–9.3(b)'s exception to the disqualification rule of N.J.S.A. 43:21–5(a). We also agree with the panel's conclusion that although Ardan would be eligible for unemployment benefits pursuant to an amendment to N.J.S.A. 43:21–5(a) enacted three years after she filed her application, that amendment does not apply retroactively to her case. See L. 2015, c. 41 (amending N.J.S.A. 43:21–5(a) ).

We therefore affirm as modified the Appellate Division's judgment affirming the denial of Ardan's application for unemployment benefits.

I.

We derive our summary of the facts from the record presented to the Department of Labor and Workforce Development Appeal Tribunal and the Board of Review.

On September 7, 2010, Ardan was employed as a registered nurse at Lourdes Medical Center of Burlington County, Inc. (Medical Center). Although she was hired as a part-time employee, Ardan typically worked thirty-six hours per week. At the

conclusion of Ardan's employment, the Medical Center paid her $29.76 per hour. As part of her patient-care responsibilities, Ardan was required to walk substantial distances, as well as to bend, lift, shift, and transfer patients.

According to her testimony and medical records, Ardan suffered from chronic neck, lower-back, and left-knee pain for many years before she began working at the Medical Center. Her treatment records for the period in which she was employed at the Medical Center indicate that her condition was permanent and that her pain made it difficult for her to do her job. Ardan did not disclose her orthopedic condition to her employer during her tenure at the Medical Center and did not request less strenuous duties.

In 2012, Alliance Healthcare (Alliance) hired Ardan as a health-care communicator. Ardan characterized the Alliance job as "exactly what [she] had been looking for"—a nursing "desk job" that would "reduce the physical impact on [her] body" but did not entail a substantial reduction in her hourly wages. Ardan resigned from the Medical Center by letter dated November 7, 2012. In her resignation letter, Ardan stated that she was leaving "to seek another opportunity." She did not mention any medical condition as a factor in her departure.

Ardan began work for Alliance on November 12, 2012. Seven weeks later, on December 27, 2012, Alliance terminated her employment. Ardan attributed her termination to her failure to pass certification examinations that were required for her position.

On December 23, 2012, Ardan applied for unemployment compensation. The Deputy Director of the Division of Unemployment and Disability Insurance disqualified Ardan from receiving benefits because her "reason for leaving was personal"; her reason did "not constitute good cause attributable to the work"; and although she had obtained subsequent employment, Ardan had "not earned at least ten times [her] weekly benefit rate in at least eight weeks of employment as required by law."

Ardan appealed to the Appeal Tribunal. Appearing pro se at the hearing before the Tribunal, Ardan did not disclose that she had resigned from the Medical Center because her work had aggravated her preexisting orthopedic condition. Instead, she testified generally that the physical demands of the job were "way too much." Ardan confirmed that she advised the Medical Center only that she was leaving for another opportunity, and conceded that she "didn't talk to anybody" representing her employer about her departure. The Appeal Tribunal affirmed the Deputy Director's ruling disqualifying Ardan from unemployment benefits under N.J.S.A. 43:21-5(a).

Ardan retained counsel and appealed to the Board of Review. For the first time, Ardan relied on N.J.A.C. 12:17-9.3(b)'s medical exception, and presented evidence that her orthopedic condition prompted her departure from the Medical Center.[1] She explained to the Board of Review that she had not detailed her medical condition to the Appeal Tribunal because she had considered "where I choose to work and why I choose to leave a job" to be a private matter.

The Board remanded the case to the Appeal Tribunal for a new hearing and decision based on the medical evidence that Ardan submitted. At the hearing on remand, Ardan testified that she did not request that the Medical Center explore an alternative position for her because "it was not an option; it was not available to request accommodations or to ask for another position." She stated that the Medical Center assigned nurses to "light duty" but only on a temporary basis; that she was compelled to work as a registered nurse as a condition of a scholarship that the Medical

---

[1] Ardan presented to the Board of Review a treating physician's report, in which her physician recommended that she leave her position at the Medical Center for a job that would be less physically demanding. That report was dated July 16, 2013, almost a year after Ardan's departure from the Medical Center. Ardan testified that to the best of her recollection, the physician had advised her during her employment at the Medical Center as well as after the conclusion of that employment that she should seek a less demanding job.

Center's nursing school had awarded her; that she lacked the educational qualifications for "any kind of management or administrative" position; and that the only available positions would be "lower positions like becoming a Nursing Assistant which also has ... the same physical requirements as [the job of a registered nurse]." As her testimony made clear, Ardan arrived at those conclusions on her own, without communicating with her employer regarding her medical condition.

Following the hearing on remand, the Appeal Tribunal again determined that Ardan had left her position with the Medical Center voluntarily without good cause attributable to the work, and disqualified her from unemployment benefits pursuant to N.J.S.A. 43:21–5(a). Ardan appealed to the Board of Review. The Board of Review affirmed the Appeal Tribunal's denial of benefits, and Ardan again appealed.

An Appellate Division panel affirmed the determination of the Board of Review. Ardan v. Bd. of Review, 444 N.J. Super. 576, 590, 134 A.3d 1018 (App. Div. 2016). The panel concluded that the Board of Review had properly construed N.J.A.C. 12:17–9.3(b) to require an employee "to notify an employer of a medical condition that was aggravated by the working conditions, request an accommodation, and afford the employer an opportunity to address the matter to determine whether there was other suitable work available." Id. at 586, 134 A.3d 1018. The panel noted that although the medical evidence established that Ardan was unable to work at the Medical Center "due to a non-work connected medical condition that was aggravated by her working conditions, [Ardan] made no attempt whatsoever to protect her employment." Id. at 585–86, 134 A.3d 1018.

The panel concluded that Ardan was disqualified for benefits not only under N.J.S.A. 43:21–5(a), but pursuant to a regulation that deems an employee "who leaves work '[t]o accept other work' ... to have left work voluntarily without good cause attributable to the work." Id. at 586, 134 A.3d 1018 (quoting N.J.A.C. 12:17–9.1(e)(9) ). The panel rejected Ardan's argument that the 2015

amendment to N.J.S.A. 43:21–5(a), which would have allowed her to receive benefits, should apply retroactively to her. Id. at 586–90, 134 A.3d 1018.

We granted certification. 229 N.J. 135, 160 A.3d 693 (2017).

## II.

Ardan argues that her case is governed by N.J.A.C. 12:17–9.3(b) because she left her job at the Medical Center due to a medical condition that was not work-related and there was no suitable work available for her at that facility. She contests the Appellate Division's holding that an employee must prove that she advised the former employer of the medical condition and formally requested an accommodation in order to avoid disqualification from benefits under N.J.S.A. 43:21–5(a). Ardan contends that no such requirement is imposed by the relevant statutes, regulations, or judicial decisions, and that the Department of Labor could impose such a mandate only through rulemaking. In the alternative, Ardan contends that the Court should retroactively apply the 2015 amendment to N.J.S.A. 43:21–5(a) to her case and that she is entitled to benefits under that amendment.

The Board of Review counters that Ardan left her position at the Medical Center voluntarily without good cause attributable to her work, and is therefore ineligible for unemployment benefits under N.J.S.A. 43:21–5(a). It argues that N.J.A.C. 12:17–9.3(b) requires a claimant who left a position due to a non-work-related medical condition to prove that the claimant requested alternative work that she could have performed despite her medical condition. The Board of Review asserts that the 2015 amendment to N.J.A.C. 12:17–9.3(b) is prospective only, and is therefore irrelevant to this appeal.

The Medical Center adopts the Board of Review's arguments. In statements made for the first time at oral argument, the Medical Center represents that when an employee informs it of a medical condition and requests an accommodation, it engages in an interactive process in accordance with the Americans with

Disabilities Act. 42 U.S.C. § 12112(b)(5); 29 C.F.R. § 1630.2(*o*)(3). The Medical Center asserts that in such cases, its Human Resources Department determines whether there are suitable positions available to the employee. The Medical Center states that its network of two acute care hospitals and nearly 100 physician practices employs more than 2000 employees.

### III.

### A.

### 1.

The Legislature enacted the Unemployment Compensation Law to further an important public policy: alleviating the burden of involuntary unemployment, a burden that "now so often falls with crushing force upon the unemployed worker and his family." N.J.S.A. 43:21–2. The statute establishes "a cushion for the workers of New Jersey against the shocks and rigors of unemployment." Brady v. Bd. of Review, 152 N.J. 197, 212, 704 A.2d 547 (1997) (quoting Carpet Remnant Warehouse v. Dep't of Labor, 125 N.J. 567, 581, 593 A.2d 1177 (1991) (internal quotation marks removed) ). It is intended to "provide some income for the worker earning nothing, because he is out of work through no fault or act of his own." Yardville Supply Co. v. Bd. of Review, 114 N.J. 371, 375, 554 A.2d 1337 (1989) (emphasis removed) (quoting Schock v. Bd. of Review, 89 N.J. Super. 118, 125, 214 A.2d 40 (App. Div. 1965) ).

■ "In order to further its remedial and beneficial purposes, the [Unemployment Compensation Law] is to be construed liberally in favor of allowance of benefits." Id. at 374, 554 A.2d 1337. We "must carry in mind the dire and distressing situations against which the statute, as a matter of stated public policy, is directed." Brady, 152 N.J. at 212, 704 A.2d 547 (quoting W.T. Grant Co. v. Bd. of Review, 129 N.J.L. 402, 405, 29 A.2d 858 (1943) ).

■ We have also recognized, however, the importance of "preserv[ing] the [unemployment insurance trust] fund against claims by those not intended to share in its benefits. The basic policy of the law is advanced as well when benefits are denied in improper cases as when they are allowed in proper cases." Ibid. (second alteration in original) (quoting Yardville, 114 N.J. at 374, 554 A.2d 1337). The Unemployment Compensation Law "is designed to serve not simply the interest of the unemployed, but also the interest of the general public." Ibid.

■ The Unemployment Compensation Law "protects not only workers who are involuntarily unemployed—those who are laid-off or terminated from their jobs by their employers—but also those who voluntarily quit their jobs for good cause attributable to their work." Utley v. Bd. of Review, 194 N.J. 534, 543–44, 946 A.2d 1039 (2008). The Legislature "amended the statute in 1961 to disqualify claimants who left work for purely personal reasons." Brady, 152 N.J. at 213, 704 A.2d 547. The statute provides that a claimant is disqualified from receiving benefits "[f]or the week in which the individual has left work voluntarily without good cause attributable to such work, and for each week thereafter until the individual becomes reemployed and works eight weeks in employment." N.J.S.A. 43:21–5(a).

■ In applying that provision, "a court must 'differentiate between (1) a voluntary quit with good cause attributable to the work and (2) a voluntary quit without good cause attributable to the work.'" Brady, 152 N.J. at 213–14, 704 A.2d 547 (quoting Self v. Bd. of Review, 91 N.J. 453, 457, 453 A.2d 170 (1982) ).

■ As it appears in N.J.S.A. 43:21–5(a), the phrase "good cause attributable to such work" denotes "a reason related directly to the individual's employment, which was so compelling as to give the individual no choice but to leave the employment." N.J.A.C. 12:17–9.1(b). "The test of 'ordinary common sense and prudence' must be utilized to determine whether an employee's decision to leave work constitutes good cause." Brady, 152 N.J. at 214, 704

A.2d 547 (quoting Zielenski v. Bd. of Review, 85 N.J. Super. 46, 52, 203 A.2d 635 (App. Div. 1964) ). A regulation sets forth a non-exhaustive list of examples in which a claimant's separation from employment "shall be reviewed as a voluntarily leaving work issue":

1. Lack of transportation;
2. Care of children or other relatives;
3. School attendance;
4. Self-employment;
5. Lack of housing;
6. Relocating to another area for personal reasons;
7. Relocating to another area to accompany a spouse, a civil union partner, or other relatives;
8. Voluntary retirement;
9. To accept other work; or
10. Incarceration.

[N.J.A.C. 12:17–9.1(e).]

In the wake of a voluntary departure from work, the claimant bears the burden "to establish good cause attributable to such work for leaving." N.J.A.C. 12:17–9.1(c); see also Brady, 152 N.J. at 218, 704 A.2d 547.

In 1998, the Department of Labor promulgated a regulation that exempted from disqualification under N.J.S.A. 43:21–5(a) certain claimants who left prior work due to medical conditions exacerbated by their working conditions:

An individual who leaves a job due to a physical and/or mental condition or state of health which does not have a work-connected origin but is aggravated by working conditions will not be disqualified for benefits for voluntarily leaving work without good cause "attributable to such work," provided there was no other suitable work available which the individual could have performed within the limits of the disability.

[N.J.A.C. 12:17–9.3(b).]

Although the claimant bears the burden of demonstrating that she is within the parameters of N.J.A.C. 12:17–9.3(b), the regulation does not prescribe what proofs the claimant must present to demonstrate that there was no "suitable work" that could be performed "within the limits of the disability." Ibid. Prior to this case, neither this Court nor the Appellate Division had specified

the showing that a claimant must make to demonstrate that she is within N.J.A.C. 12:17–9.3(b)'s exception to disqualification under N.J.S.A. 43:21–5(a).[2]

2.

■ Against that backdrop, we review the Board of Review's determination that Ardan left her position at the Medical Center voluntarily without good cause attributable to such work.

■ We conduct that inquiry in accordance with a familiar standard of review. In an appeal from a final agency decision, an appellate court is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." US Bank, N.A. v. Hough, 210 N.J. 187, 200, 42 A.3d 870 (2012) (quoting Univ. Cottage Club of Princeton N.J. Corp. v. Dep't of Envtl. Prot., 191 N.J. 38, 48, 921 A.2d 1122 (2007) ).

■ Nonetheless, we "defer to an agency's interpretation of both a statute and implementing regulation, within the sphere of the agency's authority, unless the interpretation is plainly unreasonable." In re Election Law Enf't Comm'n Advisory Op. No. 01–2008, 201 N.J. 254, 262, 989 A.2d 1254 (2010) (quoting Reilly v. AAA Mid–Atl. Ins. Co. of N.J., 194 N.J. 474, 485, 946 A.2d 564 (2008) (internal quotation marks omitted) ). That deference derives from our "understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." Ibid.

■ "To apply the 'plainly unreasonable' standard, we first consider the words of the statute, affording to those words 'their ordinary and commonsense meaning.'" In re Eastwick Coll. LPN-

---

2 Before N.J.A.C. 12:17–9.3(b) was promulgated, this Court observed that "[t]he only recognized exception to [N.J.S.A. 43:21–5(a)'s disqualification] rule exists where an employee, unable to work because of illness, nevertheless makes an attempt to protect his or her employment." Yardville, 114 N.J. at 376, 554 A.2d 1337.

to-RN Bridge Program, 225 N.J. 533, 542, 139 A.3d 1146 (2016) (quoting In re Election Law Enf't Comm'n, 201 N.J. at 263, 989 A.2d 1254). "In that inquiry, '[w]e interpret a regulation in the same manner that we would interpret a statute.' " Ibid. (alteration in original) (quoting US Bank, N.A., 210 N.J. at 199, 42 A.3d 870).

Rejecting Ardan's contention that she is within the exception provided by N.J.A.C. 12:17–9.3(b), the Board of Review construed the regulation to globally require proof that the claimant notified the employer of her medical condition, and requested an accommodation. The Appellate Division panel agreed. Ardan, 444 N.J. Super. at 586, 134 A.3d 1018.

We do not view N.J.A.C. 12:17–9.3(b) to generally impose a notice-and-inquiry requirement on every claimant who has departed her work because that work aggravated a medical condition. By its plain terms, the regulation defines what the claimant must prove: that there was "no other suitable work available which the individual could have performed within the limits of the disability." N.J.A.C. 12:17–9.3(b).

Applied to a vast range of workplace settings, that standard calls for an individualized determination; it does not mandate in every case that the claimant demonstrate that she notified the employer of the medical condition and sought an alternative position that would accommodate that condition. In some cases, the claimant's medical proofs, combined with evidence of the physical demands of the former employment, the small size of the workplace, or other relevant factors, will be sufficient to satisfy the claimant's burden to demonstrate the unavailability of alternative "suitable work." In other circumstances, a claimant will not be in a position to meet that burden absent proof that she notified the employer and sought an accommodation prior to resigning from the job.

To be sure, the imposition of a notice-and-inquiry requirement in N.J.A.C. 12:17–9.3(b) would prompt some employees and employers to jointly address the employee's working conditions

and consider accommodations, thus advancing the public policy expressed in the Unemployment Compensation Law. Any such requirement, however, may be generally imposed only by rule-making pursuant to the APA. N.J.S.A. 52:14B–4; see also In re Provision of Basic Generation Serv. for Period Beginning June 1, 2008, 205 N.J. 339, 348–50, 15 A.3d 829 (2011) ("Agencies should act through rulemaking procedures when the action is intended to have a 'widespread, continuing, and prospective effect,' deals with policy issues, materially changes existing laws, or when the action will benefit from rulemaking's flexible fact-finding procedures." (quoting Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 331, 478 A.2d 742 (1984) ) ). As this Court has observed, an agency action constitutes rulemaking if it appears, "in many or most of the following circumstances," that the action

> (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
>
> [Metromedia, 97 N.J. at 331–32, 478 A.2d 742.]

We noted that "[t]hese relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication." Id. at 332, 478 A.2d 742.

The "agency action" in this case—the Board of Review's imposition of a general requirement that a claimant prove notice to the employer and a request for an accommodation in order to satisfy the burden imposed by N.J.A.C. 12:17–9.3(b)—meets the Metromedia test. That action would establish a "legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization." Id. at 331, 478 A.2d 742. It would state an administrative policy that

was not previously expressed in "any official and explicit agency determination, adjudication or rule." Ibid. That legal standard and agency policy cannot be implemented by means of the adjudication of this or any other action. It requires rulemaking.

Accordingly, we find that aspect of the Board of Review's interpretation of N.J.A.C. 12:17–9.3(b) to be plainly unreasonable.

■ Nonetheless, even if N.J.A.C. 12:17–9.3(b) is not read to impose a general notice-and-inquiry requirement, Ardan failed to meet the burden imposed by the regulation. N.J.A.C. 12:17–9.3(b)'s plain language compels a showing that, at the time of the claimant's departure, either the employer had no position available that would accommodate the claimant's condition or the claimant would not have been assigned to any such position. Here, Ardan worked for a medical and surgical hospital that employs hundreds of employees. See Consumer Reports, All Hospital Ratings: Lourdes Medical Center, https://www.consumerreports.org/health/hospitals/lourdes-medical-center-of-burlington-county/hospital-information/6220547/ (last visited Jan. 5, 2018); Am. Hosp. Ass'n, AHA Guide to the Health Care Field at A–425 (2017 ed.). Despite the substantial size of her employer's facility, Ardan did not investigate alternative nursing opportunities, either with the assistance of human resources personnel or on her own. Instead, Ardan surmised that the Medical Center would have denied her a "light duty" nursing assignment, that it would have deemed her unqualified for management or administrative jobs, that it would have restricted her opportunities because of the conditions of her scholarship, and that at best, it would have demoted her to a lower-ranking but physically demanding job as a nursing assistant.

Nothing in the record supports Ardan's conclusory assertion that any effort to secure a reassignment to "suitable work" at the Medical Center would have proven futile. As our dissenting colleagues emphasize, Ardan testified that she did not contact her employer to explore alternative positions because she did not believe that the Medical Center would offer her light duty work or

a less demanding position. Post at 615–16, 177 A.3d at 783–84.[3] Ardan, however, presented no proof that "suitable work" was unavailable to her at the Medical Center. She submitted no job descriptions or other documents indicating what positions were open when she left her employment. Ardan conceded that she told the Medical Center nothing about her medical condition because she considered that information private, that she sought no accommodation, and that she represented to the Medical Center that she was leaving for another position, not that she was unable to perform her job duties for medical reasons. As her testimony confirms, Ardan's contention that no accommodation was available to her at the Medical Center was premised on nothing but speculation. In short, Ardan failed to establish that no "suitable work" was available to her at the Medical Center.

We therefore conclude that the Board of Review properly found that Ardan failed to meet her burden to demonstrate that her case is within the exception prescribed by N.J.A.C. 12:17–9.3(b) and that, for purposes of N.J.S.A. 43:21–5(a), she "left work voluntarily without good cause attributable to such work."

### B.

We review de novo the Appellate Division's determination that the 2015 amendment to N.J.S.A. 43:21–5(a) does not retroactively apply to Ardan's application for unemployment compensation. See Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386, 143 A.3d 254 (2016) (noting that question of retroactivity of statute "is a purely legal question of statutory interpretation" subject to plenary review).

---

3 Our dissenting colleagues stress that Ardan's testimony about her reasons for not inquiring about available positions was "uncontroverted" and "uncontradicted." Post at 615–16, 177 A.3d at 783–84. Because Ardan presented only her subjective view as to what would have occurred had she sought an accommodation rather than evidence of an actual inquiry, it is unclear how the Board of Review or the Medical Center could have rebutted her testimony in that regard.

The amendment at issue created an exception to the general rule that a claimant who left her work "[t]o accept other work" is deemed to have departed voluntarily without "good cause attributable to such work." N.J.S.A. 43:21–5(a); N.J.A.C. 12:17–9.1(e). Under the amended statute, that rule

> shall not apply to an individual who voluntarily leaves work with one employer to accept from another employer employment which commences not more than seven days after the individual leaves employment with the first employer, if the employment with the second employer has weekly hours or pay not less than the hours or pay of the employment of the first employer.
>
> [N.J.S.A. 43:21–5(a).]

All parties agree that if N.J.S.A. 43:21–5(a) as amended in 2015 were to apply retroactively to Ardan's 2012 claim for unemployment benefits, she would not be disqualified for unemployment benefits under the statute. If, as the Appellate Division held, the amendment applies only prospectively, Ardan's application for benefits was properly denied.

The 2015 amendment is silent as to the question of retroactivity. See ibid. Its legislative history indicates that the Legislature understood the amendment to effect a significant change in the law:

> Current law ... disqualifies an individual who voluntarily leaves a job from receiving [unemployment insurance] benefits and requires the individual to become reemployed and work at least eight weeks, earning at least 10 times the individual's weekly [unemployment insurance] benefit rate, before again being eligible for [unemployment insurance] benefits. This bill makes an exception from that requirement for an individual who leaves one job to accept a subsequent job at least equal in hours or pay, but is laid off from the subsequent job.
>
> [A. Appropriations Comm. Statement to S. 2082 (Feb. 5, 2015).]

As explained by one of its sponsors, the amendment was intended "to take a system right now where people are falling through the cracks to ensure that they don't." Hearing on S. Comm. Substitute for S. 2082 before the S. Labor Comm., 216th Leg., at 11 (statement of Sen. Fred Madden, Jr.).

 "Settled rules of statutory construction favor prospective rather than retroactive application of new legislation." James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563, 83 A.3d 70 (2014). Those

rules are "based on our long-held notions of fairness and due process." Id. at 563, 83 A.3d 70 (quoting Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 45, 947 A.2d 1228 (2008)). We consider (1) "whether the Legislature intended to give the statute retroactive application" and (2) whether retroactive application "will result in either an unconstitutional interference with vested rights or a manifest injustice." Id. at 563, 83 A.3d 70 (quoting In re D.C., 146 N.J. 31, 50, 679 A.2d 634 (1996)). Applying the first prong of the retroactivity standard, we recognize three circumstances that justify affording "a statute retroactive effect: (1) when the Legislature expresses its intent that the law apply retroactively, either expressly or implicitly; (2) when an amendment is curative; or (3) when the expectations of the parties so warrant." Ibid.

We apply that standard to the 2015 amendment to N.J.S.A. 43:21–5(a). Although an "expression of legislative intent [to make a statute retroactive] should be given effect absent a compelling reason not to do so," id. at 564, 83 A.3d 70, we find no such expression in the statute at issue here.[4] We are unpersuaded

---

[4] In support of her argument that the 2015 amendment to N.J.S.A. 43:21-5(a) should apply retroactively to her case, Ardan relies in part on the Bureau of Program Services & Standards' Administrative Instruction dated July 21, 2015. That Administrative Instruction stated that "[p]er a recent decision by the Superior Court of New Jersey, any voluntary quit separation that meets the conditions of [N.J.S.A. 43:21-5(a) as amended] must be adjudicated under the revised statute regardless of the date of the voluntary quit." Bureau of Program Servs. & Standards, Dep't of Labor & Workforce Dev., Administrative Instruction: Voluntary Quit for Other Work, at 6 (July 21, 2015). As the Board of Review confirmed at oral argument, that Administrative Instruction, which was issued in response to an unpublished decision of an Appellate Division panel, was superseded by an Administrative Instruction issued after the Appellate Division decision in Ardan, 444 N.J. Super. at 590, 134 A.3d 1018. The subsequent Administrative Instruction provided that "[p]er a recent court ruling, a voluntary quit determination under the revised laws cannot be applied retroactively. The new [voluntary quit] law is effective May 4, 2015 and can only be applied to separations occurring from that date or later." Bureau of Program Servs. & Standards, Dep't of Labor & Workforce Dev., Administrative Instruction: Voluntary Quit for Other Work, at 5 (June 1, 2016).

by the evidence of legislative intent invoked by our dissenting colleagues: the amendment's sponsor's statement that the amendment would provide benefits to claimants who, under current law, "fall through the cracks." Post at 619, 620–21, 177 A.3d at 786, 787. To the contrary, that statement confirms that the Legislature intended to expand its clear and unambiguous statute so that a broader category of claimants would qualify for benefits in the future.[5]

Moreover, we do not consider the amendment "curative" for purposes of retroactivity analysis. To be "curative," a statutory provision must be "designed to 'remedy a perceived imperfection in or misapplication of a statute.' " Ibid. (quoting Schiavo v. John F. Kennedy Hosp., 258 N.J. Super. 380, 386, 609 A.2d 781 (App. Div. 1992), aff'd, 131 N.J. 400, 620 A.2d 1050 (1993) ). "[A]n amendment is curative if it does 'not alter the act in any substantial way, but merely clarifie[s] the legislative intent behind the [previous] act.' " Ibid. (second and third alterations in original) (quoting 2nd Roc–Jersey Assocs. v. Town of Morristown, 158 N.J. 581, 605, 731 A.2d 1 (1999) ). "Generally, curative acts are made necessary by inadvertence or error in the original enactment of a statute or in its administration." Ibid. (quoting 2 Sutherland, Statutory Construction, § 41.11 at 417 (5th ed. 1991) ).

The 2015 amendment to N.J.S.A. 43:21–5(a) is not "curative," as that term is used in retroactivity analysis. There is no evidence that the Legislature revised N.J.S.A. 43:21–5(a) because the prior

---

[5] The two cases on which our dissenting colleagues rely with respect to the issue of legislative intent are distinct from this appeal; in both, the Court found evidence that the Legislature had intended its amendment to apply retroactively. See D.C., 146 N.J. at 54, 679 A.2d 634 (holding that the Legislature had amended the civil commitment statute "not only to validate the Attorney General's exercise of authority through its retroactive application, but also to recognize the validity of the actions taken" by the Attorney General in the commitment proceeding at issue and other prior proceedings); Gibbons, 86 N.J. at 520–21 n.4, 432 A.2d 80 (citing Senate Judiciary Committee's statement that a provision in a prior draft, stating that the amendment was prospective only, was deleted "to make [the amendment] applicable to pending actions"). In this case, however, there is no indication that the Legislature envisioned that the 2015 amendments to N.J.S.A. 43:21–5(a) would apply retroactively.

version of the statute contained an error or ambiguity. Instead, as the statutory text reflects and the legislative history confirms, the amendment was intended to expand the law; it made unemployment benefits available to a group of claimants who were excluded under prior law because they had left work for another job. N.J.S.A. 43:21–5(a); see also A. Appropriations Comm. Statement to S. 2082 (Feb. 5, 2015); Hearing on S. Comm. Substitute for S. 2082 before the S. Labor Comm., 216th Leg., at 11 (statement of Sen. Fred Madden, Jr.). The 2015 amendment to N.J.S.A. 43:21–5(a) significantly altered that statute's reach; it is not within the "curative exception to the general rule favoring the prospective application of statutes." James, 216 N.J. at 572, 83 A.3d 70.

■ Our dissenting colleagues contend that because the Legislature recognized that N.J.S.A. 43:21–5(a) excluded certain claimants and acted to expand and improve the law, the statute should be deemed "curative" for purposes of retroactivity analysis. Post at 620–21, 177 A.3d at 786–87. That contention would starkly expand the definition of a "curative" amendment. As an Appellate Division panel observed:

> Nor can the curative exception be invoked merely because an amendment is deemed to better a statutory scheme. Presumably, each time the Legislature amends a statute it acts in good faith and seeks, by the amendment, to improve the scheme. If this was all that was required in order to meet the curative exception, every amendment would automatically be subject to retroactive application and the exception would engulf the rule of prospectivity.

[Kendall v. Snedeker, 219 N.J. Super. 283, 289, 530 A.2d 334 (App. Div. 1987).]

■ Under our retroactivity analysis, a legislative amendment is not considered "curative" merely because the Legislature has altered a statute so that it better serves public policy objectives. See, e.g., James, 216 N.J. at 572, 83 A.3d 70 (rejecting argument that N.J.S.A. 17:28–1.1(f), barring application of "step-down" provisions in business entities' motor vehicle insurance policies to limit uninsured motorist/underinsured motorist coverage, was "curative"); Johnson, 226 N.J. at 391–92, 143 A.3d 254 (holding that statutory amendment "based on public policy considerations," barring insurers providing Personal Injury Protection coverage

from receiving reimbursements that "would prevent the injured party from being made whole," was not curative). The amendment at issue here is similarly beyond the narrow definition of a "curative" change to a statute.

Finally, retroactive application of N.J.S.A. 43:21–5(a) is not warranted by the "expectations of the parties" in this case. Id. at 565, 83 A.3d 70 (quoting Gibbons v. Gibbons, 86 N.J. 515, 523, 432 A.2d 80 (1981)). As is reflected by the evidence submitted to the Appeal Tribunal in 2013, all parties expected the matter to be governed by the version of N.J.S.A. 43:21–5(a) in effect at that time, and by N.J.A.C. 12:17–9.1(e)(9), which unambiguously disqualified individuals who left work "[t]o accept other work" from unemployment benefits. Thus, the "expectations of the parties" prong of our retroactivity analysis has no bearing here.

In sum, an application of our retroactivity analysis to this case clearly indicates that the Legislature intended the disputed amendment to apply prospectively.[6] The Appellate Division panel properly decided this appeal based on the version of the statute that was in effect when Ardan applied for unemployment benefits in 2012.

## IV.

The judgment of the Appellate Division is affirmed as modified.

CHIEF JUSTICE RABNER and JUSTICES FERNANDEZ–VINA and SOLOMON join in JUSTICE PATTERSON's opinion. JUSTICE LaVECCHIA filed a separate, dissenting opinion, in which JUSTICES ALBIN and TIMPONE join.

---

[6] Because we conclude that the 2015 amendment to N.J.S.A. 43:21-5(a) was not intended to apply retroactively, we do not reach the question of whether retroactive application would give rise to "either an unconstitutional interference with vested rights or a manifest injustice." James, 216 N.J. at 563, 83 A.3d 70 (quoting D.C., 146 N.J. at 50, 679 A.2d 634 (internal quotation marks omitted)).

JUSTICE LaVECCHIA, dissenting.

Appellant Margo S. Ardan left her nursing position at Lourdes Medical Center because she suffered from a debilitating medical condition exacerbated by her employment. She believed that seeking an accommodation from Lourdes before leaving her employment would have been an exercise in futility. Indeed, no statute or regulation required that she make a futile application as a condition of later receiving unemployment benefits. Yet now the majority—like the Board of Review and the Appellate Division—faults her for not doing so and denies her those benefits to which she is entitled.

The majority, moreover, denies Ardan the benefit of a statutory amendment—enacted while her case was on appeal—specifically intended to protect the workers that fit within her class. As applied to this case, the amendment would allow Ardan to receive the unemployment benefits she has been denied. The denial of benefits here is not only unjust, but cannot be squared with the unemployment statute's "remedial and beneficial purposes," in deference to which the law must be "construed liberally in favor of allowance of benefits." Yardville Supply Co. v. Bd. of Review, 114 N.J. 371, 374, 554 A.2d 1337 (1989).

I.

N.J.S.A. 43:21–5(a) provides that a person shall be disqualified from unemployment benefits "[f]or the week in which the individual has left work voluntarily without good cause attributable to such work, and for each week thereafter until the individual becomes reemployed and works eight weeks in employment." As defined by the implementing regulations, " 'good cause attributable to such work' means a reason related directly to the individual's employment, which was so compelling as to give the individual no choice but to leave the employment." N.J.A.C. 12:17–9.1(b). However, there are several exceptions to that requirement, including when a person leaves his or her employment due to health or other medical reasons.

Specifically, N.J.A.C. 12:17–9.3(b) states:

An individual who leaves a job due to a physical and/or mental condition or state of health which does not have a work-connected origin but is aggravated by working conditions will not be disqualified for benefits for voluntarily leaving work without good cause "attributable to such work," provided there was no other suitable work available which the individual could have performed within the limits of the disability. When a non-work connected physical and/or mental condition makes it necessary for an individual to leave work due to an inability to perform the job, the individual shall be disqualified for benefits for voluntarily leaving work.

Ardan believes she met this exception, and her position is supported by uncontroverted testimony before the appeal tribunal.

As to her health during her employment at Lourdes Medical Center, Ardan testified that her chiropractor had told her, on several occasions, "that the type of work I was doing was aggravating the situation, making things worse and I probably won't feel better unless I ... found a different kind of work." Her physician also noted in a letter that was admitted into evidence that

[a]s a direct result of long hours standing and walking on the hard surfaces lifting and moving patients ... Ms. Ardan was unable to continue to maintain gainful employment in that specific area of nursing. Consequently based on my best medical recommendation and those of other physicians and therapists caring for her I strongly recommend that she stop working at Lourdes in that capacity and get a less physically demanding job.

Concerning whether there was other "suitable work" available, Ardan testified that there was not. When asked about the possibility of Lourdes providing her with an accommodation, she testified as follows:

For one I know that they do offer the option of light duty for some people if you get ... you know, let's say you trip and fall and break your arm you can request light duty but it's on a temporary basis. It is not a permanent situation. You know, light duty is for a specified period of time and that light duty is just not an option for an RN. You know, the care of the patient is ... primarily falls in my ... under my responsibility and if I can't perform the duties then I can't be an RN there. I was hired as an RN. I was under contract as an RN because of ... I had taken scholarship money from Lourdes Nursing school which is where I had gone to school and I had agreed to work for them as an RN after graduating from school for a certain period of time. I don't have the education necessary to move into any kind of management or administrative ... they require bachelor degrees. I continue to work on my bachelor's degree in hope of that becoming an available opportunity to me but at that time the only position[s] that would have been available were lower ... lower positions like becoming a Nursing Assistant which

also has ... has the same physical requirements as an RN. So there ... it was not an option; it was not available to request accommodations or to ask for another position.

There is nothing to suggest that this testimony was in any way unreliable; the only party that could have disputed such testimony—Ardan's employer—did not bother to appear at the hearing at which that testimony was adduced. Ferdinand v. Agric. Ins. Co., 22 N.J. 482, 498, 126 A.2d 323 (1956) ("[W]here the uncontradicted testimony of a witness, interested or otherwise, is unaffected by any conflicting inferences to be drawn from it and is not improbable, extraordinary or surprising in its nature, or there is no other ground for hesitating to accept it as the truth, there is no reason for denying the verdict dictated by such evidence.").

Despite that uncontradicted evidence in the record, the administrative agency denied Ardan unemployment benefits because she did not provide her employer with advance notice of her medical problems and thus did not give her employer a chance to accommodate her needs. The Appellate Division, in reviewing the decision, affirmed that requirement. But no such requirement appears in the plain language of N.J.A.C. 12:17–9.3(b). Rather, that prior notice requirement appears in N.J.A.C. 12:17–9.3(c), which states:

Notwithstanding (b) above, an individual who has been absent because of a personal illness or physical and/or mental condition shall not be subject to disqualification for voluntarily leaving work if the individual has made a reasonable effort to preserve his or her employment, but has still been terminated by the employer. A reasonable effort is evidenced by the employee's notification to the employer, requesting a leave of absence or having taken other steps to protect his or her employment.

[ (emphasis added). ]

The Appellate Division's analysis conflated the requirements of N.J.A.C. 12:17–9.3(b) and (c). However, the fact that a notice requirement appears in (c) and not in (b) is evidence that such a requirement should not be read into section (b) to Ardan's disadvantage. See GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 308, 625 A.2d 468 (1993) ("[W]here the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.").

The "notice" requirement imposed upon Ardan by the administrative agency, and condoned by the Appellate Division, finds no support in the statutory or regulatory language. N.J.A.C. 12:17–9.3(b) contains no provision requiring notice to the employer, and so Ardan's uncontested testimony before the appeal tribunal that there was no other suitable work available should have been sufficient to meet her burden under that regulation.

The notice requirement here is, in fact, a new rule of general applicability that must meet the demands required for formal agency rulemaking. See Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 331–32, 478 A.2d 742 (1984) (listing factors for determining whether agency has engaged in rulemaking). The majority agrees that the Board of Review's interpretation of N.J.A.C. 12:17–9.3(b) is unreasonable and that the regulation must be amended through the rulemaking process in order to impose a general notice-and-inquiry requirement. Nevertheless, the majority holds that Ardan's "conclusory assertion" that her efforts to find suitable work within Lourdes would have been futile does not meet the evidentiary burden imposed by the regulation. In that sense, the majority imposes not so much an evidentiary burden but essentially the same notice requirement as the tribunals below.

It is unclear how Ardan was supposed to know the exact parameters of that burden either when leaving employment or at the hearing when such a requirement is not present in the applicable regulation. Although she was asked by the appeal tribunal whether she had ever requested an accommodation from her employer, she was never given any indication of an explicit requirement that she put her employer on notice of her medical problems by requesting an accommodation or that proof of such a request would form part of her burden before the appeal tribunal. The after-the-fact imposition of this new requirement is profoundly unfair. Any such requirement must be clearly imposed if the unemployment compensation laws are to meet their beneficent purposes.

It is also difficult to understand how that burden was not met where her employer—the only other party with information on accommodation procedures—did not bother to participate at the second hearing before the appeal tribunal. Had the employer appeared, relevant information concerning its accommodation procedures—and what was or was not common knowledge about them—could have been brought before the appeal tribunal, and Ardan's testimony could have been rebutted. Instead, the employer chose not to involve itself in the matter until after the agency proceedings had concluded. The employer's belated effort to interject into a record new information that was not before the agency is profoundly unjust. In my view, the majority errs by relying, to any extent, on untested information and representations that the employer, without leave, sought to insert into this matter during oral argument before this Court. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 452, 916 A.2d 440 (2007) ("Our appellate courts will not ordinarily consider evidentiary material that is not in the record below."); cf. R. 2:5–5(b) (providing procedure for supplementation of administrative record). The majority's efforts on its own to bolster the record in favor of the employer is nothing other than baffling.

## II.

Faulting Ardan for failing to meet a previously unknown evidentiary burden to provide alternative notice to her employer and to prove an employer's inability to provide "other suitable work" is particularly unjust because it is plain that a person in her circumstances was meant to be protected under the terms of a 2015 amendment to N.J.S.A. 43:21–5(a). That amendment removes from the general strictures of N.J.S.A. 43:21–5(a) any

individual who voluntarily leaves work with one employer to accept from another employer employment which commences not more than seven days after the individual leaves employment with the first employer, if the employment with the second employer has weekly hours or pay not less than the hours or pay of the employment of the first employer.

[N.J.S.A. 43:21–5(a).]

There is no dispute that Ardan meets that statutory safe harbor. Yet, the majority labors to find that retroactive application to this one individual would wreak havoc on retroactivity jurisprudence. Only an antiseptic application of our retroactivity law could reach such a conclusion. In my view, retroactive application of the amendment to Ardan's disputed claim is appropriate.

Our retroactivity analysis focuses on two factors: "The first part questions whether the Legislature intended to give the statute retroactive application. The second part involves whether retroactive application of that statute will result in either an unconstitutional interference with vested rights or a manifest injustice." James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563, 83 A.3d 70 (2014) (quoting In re D.C., 146 N.J. 31, 50, 679 A.2d 634 (1996) ). The first prong of the test recognizes three circumstances that warrant "giving a statute retroactive effect: (1) when the Legislature expresses its intent that the law apply retroactively, either expressly or implicitly; (2) when an amendment is curative; or (3) when the expectations of the parties so warrant." Ibid.

The retroactive application of the statute, raised as an issue here, is not about opening dozens of prior cases but rather concerns one person who narrowly missed the protection of a statutory amendment. Although she filed her claim before the amendment was enacted, her claim was still being contested on appeal when the amendment became law. Not to afford Ardan that protection is to deny her the benefit of a remedial and beneficent statutory scheme, and an amendment that clearly focused on expanding the remedial reach of that beneficent program. Ardan is exactly the type of person the Legislature was concerned would "fall through the cracks" based on the existing wording of the unamended statutory scheme. That statement is evidence both that the Legislature intended to make the amendment retroactive and that the amendment is curative in nature.

First, such statements previously have been determined to be evidence of a legislative intent that a statute is to be applied retroactively. In Gibbons v. Gibbons, for example, we found that

"giving the [subject] statute retroactive application will fulfill the essential purpose of retroactivity, 'to effectuate the current policy declared by the legislative body,'" 86 N.J. 515, 524–25, 432 A.2d 80 (1981) (quoting Kruvant v. Twp. of Cedar Grove, 82 N.J. 435, 440, 414 A.2d 9 (1980)). And in D.C. we found a statutory amendment to be retroactive where the Legislature "intended to enact remedial legislation to effectuate its purpose" and to address a statutory flaw. 146 N.J. at 55, 679 A.2d 634. A retroactive legislative intent may also be inferred where the Legislature attempts to address a particular problem resulting from an existing loophole. See id. at 54–55, 679 A.2d 634 (finding that Legislature intended retroactive application of statutory amendment where "[t]he legislative history demonstrates that the Legislature pointedly intended the amendments to address cases such as [the case before the Court]" and where problem at issue was "the primary motivating factor behind the Legislature's enactment of these amendments").

Second, the amendment is demonstrably curative in nature. A "curative" statutory amendment is "designed to 'remedy a perceived imperfection in or misapplication of a statute.'" James, 216 N.J. at 564, 83 A.3d 70 (quoting Schiavo v. John F. Kennedy Hosp., 258 N.J. Super. 380, 386, 609 A.2d 781 (App. Div. 1992), aff'd, 131 N.J. 400, 620 A.2d 1050 (1993)). In D.C., this Court made clear that a statutory amendment that merely adds language without changing or eliminating any of the statute's original language can be curative in nature. 146 N.J. at 51–52, 679 A.2d 634. We further stated that a curative "amendment explains or clarifies existing law and brings it into 'harmony with what the Legislature originally intended.'" Id. at 51, 679 A.2d 634 (quoting Schiavo, 258 N.J. Super. at 386, 609 A.2d 781); see also Gibbons, 86 N.J. at 524, 432 A.2d 80 (stating that statutory amendment may be "curative insofar as it reflects the Legislature's attempt to improve a statutory scheme already in existence").

Here, the language added to N.J.S.A. 43:21–5(a) was meant to prevent people such as Ardan from "fall[ing] through the cracks"

of the legislative scheme. The amendment thus was pointedly addressed at people in Ardan's position and was designed to remedy a perceived statutory shortcoming whereby those in Ardan's position were being unfairly denied the benefits of the unemployment compensation safety net. Our case law acknowledges that such targeted action on the Legislature's part provides evidence of an intent to give an amendment retroactive effect. D.C., 146 N.J. at 54, 679 A.2d 634 ("The legislative intent to apply [statutory] amendments retroactively is further bolstered by a consideration of the specific purpose of those amendments and the contextual circumstances surrounding their passage."). Moreover, contrary to the majority's assertion, ante at 612–13, 177 A.3d at 782, the curative nature of the legislative action here cannot be analogized to cases involving legislative amendatory action that affects contracts or insurance. See, e.g., Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 375, 397, 143 A.3d 254 (2016) (holding that statutory amendment providing "that a personal injury protection (PIP) insurance provider may be reimbursed for payments made to an injured insured party by the tortfeasor's insurer only after the injured party's claim is fully satisfied" should not be given retroactive effect); James, 216 N.J. at 555–56, 574–75, 83 A.3d 70 (holding that statutory enactment relating to use of "step-down" provisions in employer uninsured or underinsured motorist coverage should not be given retroactive effect). Rather, the amendatory statute raised here relates directly to furthering the remedial and altruistic purposes underlying the unemployment laws. Yardville Supply Co., 114 N.J. at 374, 554 A.2d 1337; see also 2 Sutherland, Statutory Construction, § 41:1 at 385–86 (7th ed. 2009) (explaining that curative amendments encompass legislative efforts to conform legal rights and relationships to "reflect the desires of . . . the legislature").

Our Court should fulfill that beneficent amendatory intent and give the curative amendment retroactive effect for Ardan, who has steadfastly persisted in her efforts to obtain unemployment benefits. Giving Ardan the benefit of the amendatory legislation would align the unemployment benefit program with the legislative effort

to have the program's implementation better reflect the desires of the Legislature, as that intent has been more specifically expressed. In my view, to deny Ardan those benefits in the face of a legislative intent to the contrary is to elevate form over substance for purposes of retroactivity analysis and to frustrate the purposes of a remedial legislative scheme.

Accordingly, I respectfully dissent.